IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>v.<br><br>DASHAWN TYRIK EVANS-MCCLOUD,<br>        Defendant. | Criminal Case No.: 4:24CR18<br>Judge Roderick C. Young |

**Defendant Dashawn T. Evans-McCloud's Position on Sentencing**

Mr. Evans-McCloud believes this Court should reduce his sentence to less than ten (10) years for the reasons set forth below.

**Procedural History**

After being charged and arraigned on a nine-count indictment, Mr. Evans-McCloud and the United States entered into negotiations regarding a plea agreement. ECF No. 1.

The United States and Mr. Dashawn T. Evans-McCloud entered into a written plea agreement. ECF 119. This agreement amended the charges to three counts, Interference with Commerce by Robbery, in violation of 18 U.S.C §§1951(a) and 2 (Count One); and Using, Carrying, and Brandishing a Firearm During and in Relation to, and Possessing and Brandishing in Furtherance of, a Crime of Violence, in violation of 18 U.S.C §§924(c) and 2 (Count Two) (ECF 108) and Count One of the Amended Indictment. ECF Nos. 110, 117-20.

Mr. Evans-McCloud plead guilty to the charges in this Information. *Id*. A presentence report was issued. ECF No. 134. This Position on Sentencing follows.

**Factual Background**

In this matter, a mail carrier was robbed of an "arrow key" which allows the postal worker to access mail drop boxes and other USPS depository/delivery platforms. PSR 24.4-6.

This was, as Mr. Evans-McCloud admits, part of a larger plan to earn money through less than legal means. Mr. Evans-McCloud was not the ringleader of this group of young men. Rather he was an assistant who helped as instructed, including renting cars, and participating in some of the robberies. A presentence report was created. ECF 153. Sentencing is currently scheduled for February 4th.

## Legal Standards Governing Sentencing

This Court will first consider the advisory guideline range and other relevant sentencing factors outlined in 18 U.S.C. §3553(a). When fashioning a sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." Kimbrough v. United States, 552 U.S. 85 (2007).

The Guidelines are one of seven sentencing factors. The Court must consider:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed –
    a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b. To afford adequate Terrence to criminal conduct;
    c. To protect the public from further crimes of the defendant;
    d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3. The kinds of sentences available;

4. The kinds of sentence and the sentencing range established in the Federal Sentencing Guidelines;

5. Any pertinent policy statement issued by the Sentencing Commission;

6. The need to avoid unwarranted sentence disparity;

7. The need to provide restitution to any victims.

This Court must consider these factors as a part of a three-step process. First, the Court must apply the Guidelines to determine the advisory sentencing range. Next, the Court must determine if a traditional Guideline departure applies. Finally, the Court must determine if a non-Guideline sentence (a variance) is appropriate based on consideration of the seven factors listed above. Gall v. United States, 552 U.S. 38 (2007).

As stated above, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the code also listed above. Kimbrough, 552 U.S. at 101-102. This "parsimony principle" is best described in *Kimbrough*, noting that a district court's job is not to impose a reasonable sentence, but rather to impose one that is sufficient but not greater than necessary to accomplish the purposes set forth in the code. Id.

## Applying the Factors to Mr. Evans-McCloud's Case

Mr. Evans-McCloud has a confusing history as to how he became embroiled in this scheme and with the other defendants. In applying the factors, Mr. Evans-McCloud encourages the Court to consider the factors through the lens of his short life.

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

The facts of the crimes are not in dispute. Mr. Evans-McCloud took part in a plan to defraud citizens for financial gain and in the course of that plan, robbed a mail carrier. However,

this is surprisingly out of character for Mr. Evans-McCloud. Mr. Evans-McCloud was raised by his mother in the Tidewater area. Until shortly before these events unfolded, Mr. Evans-McCloud was enrolled in and attended classes at the local Community College (Richard Bland). Unfortunately, his financial situation did not allow him to continue his studies, and he accepted a job to assist in supporting his family and saving up so he could return to college. At this job, he met and began to hang out with some other people named in the Indictment and Information. Until this event, Mr. Evans-McCloud had never been in trouble with the law. As noted in the Pre-Sentence Report, Mr. Evans-McCloud has never had any gang affiliation (ECF No. 153) and did not associate with those who were affiliated. He was never charged with or convicted of any crime as a juvenile. He was never charged or convicted of any crime as an adult until this event.

Mr. Evans-McCloud will turn twenty-one (21) years old on January 24, 2025. At the time of these events, he was eighteen to nineteen (18-19) years old. The question then must be asked – Why did a young man, working his way through college without so much as a single blemish on his record, suddenly "break bad?"

A significant part of the problem is his age and his brain development.

### *The Neurobiology of the Adolescent Brain is different than an Adult's Brain*

The adolescent brain develops very slowly, and certain aspects of a person's personality and their behavior are significantly more impulsive due to the simple fact their brains have not fully developed. Even the United States Government recognizes that,

> **[t]he brain finishes developing and maturing in the mid-to-late 20s. The part of the brain behind the forehead, called the prefrontal cortex, is one of the last parts to mature. This area is responsible for skills like planning, prioritizing, and making good decisions.**

*The Teen Brain: 7 Things to Know*, National Institute of Health, National Institute

of Mental Health.[1]

Boys' and girls' brains develop differently, with "longitudinal studies [showing that] sex differences in the trajectory of brain development, with females reaching peak values of brain volumes earlier than males." Lenroot RK, Giedd JN. Sex differences in the adolescent brain. Brain Cogn. 2010 Feb;72(1):46-55. doi: 10.1016/j.bandc.2009.10.008. Epub 2009 Nov 13. PMID: 19913969; PMCID: PMC2818549.

While it is generally recognized that young adult brains are sponges for knowledge, they are not known for good decisions.

> **[T]een brains are primed for knowledge, the main stage for the "opportunities" associated with adolescence. [However,] teenage "vulnerabilities" result from the well-documented evidence of increased teenage novelty seeking (i.e. risk taking)…**

Silveri MM. Frances E. Jensen's The Teenage Brain. Cerebrum. 2015 Dec 1;2015:cer-15-15. PMID: 27408670; PMCID: PMC4938248.

The state of Missouri recognizes this developmental delay all males endure,

> **Dr. Angeline Stanislaus is the Chief Medical Officer for the Missouri Department of Mental Health. She says that, while it may seem like an 18, 20, or 22-year-old is able to make adult decisions, they are not developmentally ready just yet. This is because the brain's frontal lobe, especially the prefrontal cortex, isn't fully mature until around age 25.[2]**

Additionally,

> **Rising levels of dopamine in the brain during**

---

[1] https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know (last visited January 23, 2025)
[2] https://journeytocollege.mo.gov/when-does-the-brain-reach-maturity-its-later-than-you-think/ (last visited January 23, 2025)

> **adolescence appear to drive an increased attraction to novel and exciting experiences… It is because adolescents are immature in regard to experience that makes them vulnerable to mishaps.[3]**

Lastly, as the teenager ages into their late twenties, their brains complete their development causing past issues with bad decisions and impulsivity/risk taking to tone down.

> **"It's as if the teenage brain might need to work a little harder to hold that response back." This could help explain why teenage criminals are less likely to be repeat offenders, the researchers say—as their brains develop into adulthood, it gets easier for them to rein in their behavior.[4]**

2. The need for the sentence imposed –

    a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b. To afford adequate deterrence to criminal conduct;

The deterrence of Mr. Evans-McCloud's potential for additional criminal conduct is also discussed immediately below. In terms of his sentence being a lesson to others, it is questionable how much weight the public or those considering similar criminal plans will even know about Mr. Evans-McCloud's sentence let alone that it will steer them back to the straight and narrow road.

The United States Government have conducted several evaluations of the impact on sentence length and its impact on deterrence. Even the United States Government recognize this,

> **A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation. But that**

---

[3] https://www.smithsonianmag.com/science-nature/impulsive-teen-brain-not-based-science-180967027/ (last visited January 23, 2025)
[4] https://www.science.org/content/article/why-teenagers-are-so-impulsive (last visited January 23, 2025)

> **incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age.**

Daniel S. Nagin, "Deterrence in the Twenty-First Century," in Crime and Justice: A Review of Research, vol. 42: Crime and Justice in America: 1975-2025, ed. Michael Tonry, Chicago: University of Chicago Press, 2013.

Deterrence by sentencing is not effective. The Department of Justice recognized this in 2016, stating,

> **Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.**

U.S. Department of Justice Office of Justice Programs National Institute of Justice, Five Things about Deterrence.[5]

With Mr. Evans-McCloud's raw intellect and a lengthy prison sentence, the DOJ suggests that he would most likely come out a better criminal, rather than a rehabilitated citizen.

In 2019, the Minnesota Legislature commissioned a study on Justice Policy which concluded, "if the goal of a policy change is to deter crime, research suggests that an increase in the likelihood of being caught has a greater deterrent effect than an increase in the potential penalty." Johnson, Ben, Legislative Analyst, January 2019, *Do Criminal Laws Deter Crime? Deterrence Theory in Criminal Justice Policy: A Primer*.[6]

One study from 2021, showed that the severity of punishment and the certainty of punishment is the driving combination. In fact, this study showed that,

> **we find a surprising non-monotonic relation with deterrence: either no delay (immediate resolution and immediate punishment) or maximum delay (both resolution and punishment as much as possible delayed) emerge as most effective at deterring deviant behavior and recidivism.**

Buckenmaier J, Dimant E, Posten AC, Schmidt U. Efficient Institutions and Effective Deterrence: On Timing and Uncertainty of Formal Sanctions. J Risk Uncertain. 2021;62(2):177-201. doi: 10.1007/s11166-021-09352-x. Epub 2021 Jul

---

[5] https://www.ojp.gov/pdffiles1/nij/247350.pdf (last viewed on January 24, 2025).
[6] www.house.mn.gov/hrd/pubs/deterrence.pdf (last viewed on January 24, 2025).

23. PMID: 34316094; PMCID: PMC8298200.

To summarize, either immediate consequences or a significant period of time where the offender knows punishment could occur are the best options for deterrence; not a lengthy sentence.

      c.  To protect the public from further crimes of the defendant;

Mr. Evans-McCloud is at low risk for re-offense. He has no criminal record prior to this hearing, and had he been able to afford college, he would have not fallen into this situation. His lesson has already been learned by his arrest and incarceration for a year and a half. Mr. McCloud recognizes the mandatory seven (7) years sentence on the firearm charge but encourages the Court to limit any additional time. By the time he is released from prison, he will have fully developed his brain and matured greatly, with the added reminder of losing his twenties to prison based on bad decisions.

      d.  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

The most important consideration is that of intellectual maturity. Once Mr. Evans-McCloud's brain finishes developing, the risk level drops considerably. His raw intellect could easily be molded and strengthened into a plus for his community. Mr. Evans-McCloud therefore asks this Court to consider the available options for higher education/vocational training when sentencing Mr. Evans-McCloud, to include house arrest with specific educational and vocational requirements. (Mr. Evans-McCloud recognizes the limited ability of the Court to order specific training/education while incarcerated, and the limited ability to order an inmate to a specific location, as well as the Court's reluctance to see house arrest as a viable option with the charges

presented).

    3. The kinds of sentences available;

    4. The kinds of sentence and the sentencing range established in the Federal Sentencing Guidelines;

The sentencing range is specifically identified in the Pre-Sentence Report. The Government is requesting 190 months. Mr. Evans-McCloud is asking the Court for the required eighty-four (84) months for the firearm charge as the mandatory sentence and less than thirty-six (36) months on the remaining charges based on the arguments made above.

    5. Any pertinent policy statement issued by the Sentencing Commission;

Not applicable.

    6. The need to avoid unwarranted sentence disparity;

**Sentence in comparison with others charged**

**O'Siris Landres Charles Ford, a/k/a "Siris," (4:23CR00051-001)** pled guilty on December 21, 2023, to Counts One and Ten of a Superseding Indictment, charging Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a), and Use, Carry, and Brandish a Firearm During and in Relation to, and Possess and Brandish a Firearm in Furtherance of, a Crime of Violence, in violation of 18 U.S.C. § 924(c). On June 11, 2024, Ford appeared before the Honorable Elizabeth W. Hanes, United States District Judge, and was sentenced to 144 months of incarceration and five years of supervised release.

Mr. Osiris Ford received a sentence of 144 months for the same scheme in which Mr. Evans- McCloud was involved. However, Mr. Ford's background differs from Mr. Evans-McCloud's perfect pre-crime record. It cannot be ignored that Mr. Evans-McCloud did rob a mail carrier at gun point, however, when you consider the development level of his brain, the

scientifically proven problems with impulsivity and risk-taking of children this age, and the undue influence the older members of this group of offenders had on him, it is clear his time in prison should be appropriate for the crimes he committed, but tempered by his age, brain development, and clean record.

Additionally, Mr. Evans-McCloud relies on his arguments above to show a difference in what the Court should consider when sentencing.

> 7. The need to provide restitution to any victims.

Restitution remains unclear at this time.

### The Impact of the Crime on the Victim is Accounted for Within the Offense Level

Although there are multiple victim impact statements made by one person, only one of those statements applies to Mr. Evans-McCloud and is labeled as such. ECF No. 153-1. Here, the statements made by the victim have already been factored into the advisory guideline offense level. To allow the victim's impact statement to cause an upward adjustment would be inappropriate. See United States v. Levy, 258 F.3d 1015, 1017 (6th Cir. 2001) noting that "impermissible 'double counting' occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.").

### Other considerations

A one level reduction is appropriate as requested by the AUSA for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). ECF 151.

### Conclusion

Mr. Evans-McCloud encourages this Court not to sentence him to any period of active incarceration but recognizes that is not realistic. Therefore, he moves this Court for a sentence of less than 120 months. Mr. Evans-McCloud will, of course, provide any additional information or

   answer any questions the Court may have either prior to or at the sentencing hearing.

Dated:  January 26, 2025

Respectfully submitted,

  /s/Charles R. Samuels
Charles R. Samuels, VSB # 65899
Charles R. Samuels, Attorney at Law, PLLC
4908 Monument Ave., Ste. 100
Richmond, Virginia 23230
804-533-0841 (w)
804-677-7273 (c)
804-843-8523 (f)
E-mail:crsamuels@gmail.com
*Counsel for Mr. Evans-McCloud*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal Case No.: 3:24CR18
                                                Judge Robert E. Payne

WILLIAM HALL,
        Defendant.

### Certificate of Service

This is to certify that on Sunday, January 26, 2025, I sent a copy of this Motion and Sentencing Memorandum via e-mail to Julie D. Podlesni, Esq., at Julie.Podlesni@usdoj.gov.

                                             /s/Charles R. Samuels
                                             Charles R. Samuels, VSB # 65899
                                             Charles R. Samuels, Attorney at Law, PLLC
                                             4908 Monument Ave., Ste. 100
                                             Richmond, Virginia 23230
                                             Phone: 804-677-7273
                                             Fax: 804-843-8523
                                             E-mail:crsamuels@gmail.com
                                             *Counsel for Mr. Hall*